GIDDINGS & LEWIS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 82–2666.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1983.

Decided July 5, 1983.

Herbert P. Wiedemann, Foley & Lardner, Milwaukee, Wis., for petitioner.

Robert Sewell, National Association of Labor Relations, Washington, D.C., for respondent.

Before BAUER and WOOD, Circuit Judges, and GRANT, Senior District Judge.*

BAUER, Circuit Judge.

We deny enforcement of the National Labor Relations Board's order requiring Petitioner Giddings & Lewis, Inc. to abandon its preferential hiring list notice procedure and reinstate employees adversely affected by that procedure.

I

On October 1, 1975, employees of Petitioner Giddings & Lewis, Inc. began an economic strike which continued until November 20, 1976. *See Giddings & Lewis, Inc. v. NLRB,* 675 F.2d 926 (7th Cir.1982); *Giddings & Lewis, Inc.,* 240 N.L.R.B. 441 (1979). During the strike, the Company hired 323 permanent replacement workers. When the strike ended, the Company stopped hiring replacements and, in January 1977, established a preferential hiring list which has since been the Company's exclusive source for replacing departing employees. *Giddings & Lewis, Inc.,* 255 N.L.R.B. 742 (1981) (appendix), *enforcement denied,* 675 F.2d 926 (7th Cir.1982). The preferential hiring list originally contained the names of approximately 700 employees. During the two years immediately after the strike, the Company offered reinstatement to 323 of those employees. Two hundred thirty-seven employees accepted the offers, eighty-six employees did not. Other names were removed from the list because of retirement, death, or discharge

---

* The Hon. Robert A. Grant, Senior Judge of the United States District Court for the Northern    District of Indiana, is sitting by designation.

for strike misconduct. By February 1979 only 290 employees remained on the list.

On February 9, 1979, the Company instituted a procedure designed to update the preferential hiring list by mailing the following letter to the 290 employees still on the list:

On November 19, 1976, we received a telegram from John W. David stating that the strike, which commenced October 1, 1975, was being terminated effective November 20, 1976. After confirming with Mr. Heidenreich that the telegram was intended as an unconditional offer to return to work on behalf of all strikers, we proceeded to reinstate those strikers for whom we had openings and we placed the remainder, except those discharged for strike misconduct, on a preferential hiring list.

Subsequently, as additional openings have occurred, we have gradually reinstated some of those individuals included on the preferential hire list; however, a substantial number, including you, remain unreinstated.

Up to this point we have assumed that all those who have not been contacted in connection with specific openings still desire to be continued on the preferential hire list. Now, however, since more than two years have passed from the date the list was established, we believe it is reasonable and appropriate to require all those who are still interested in reinstatement to take affirmative action to indicate that fact to us. Therefore, we will consider the original application to remain current only until March 12, 1979.

If you wish to remain on the preferential hire list on and after March 12, 1979, you must notify us in writing and we must receive that written notice before March 12, 1979. A timely written notice will be acknowledged by return mail. IF WE DO NOT RECEIVE SUCH WRIT-

TEN NOTICE FROM YOU BEFORE MARCH 12, 1979, YOUR NAME WILL BE REMOVED FROM THE PREFERENTIAL HIRE LIST.

Employees who did not respond to the letter were removed from the hiring list. Employees who responded to the letter received this notice:

Thank you for your reply to our letter of February 9, 1979.

As requested, your name will continue to be included on the preferential hire list. Your request for reinstatement will now be considered current until September 1, 1979. If you have not been offered reinstatement by then it will be necessary for you to again establish a continuing interest in being included on the list. You must do so by written notice, which must be received by us sometime within the month of August, 1979.

This procedure was repeated at six-month intervals. Employees who did not respond within one week after the September 1, 1979, and subsequent deadlines were removed from the hiring list. They received letters reporting their removals and describing any vested retirement benefits. Employees who responded were retained on the list and received a form of the above notice explaining the need to reaffirm their interests before the next deadline.

The International Association of Machinists and Aerospace Workers, Local 1402—the union representing the employees—filed an unfair labor practice charge alleging wrongful termination of an employee's preferential hiring rights in violation of the National Labor Relations Act, 29 U.S.C. §§ 151–169 (1947) (the Act). A complaint encompassing the discharged employee and all employees similarly situated issued on May 10, 1981, and a hearing was held before an administrative law judge. The ALJ ruled that the Company violated Sections 8(a)(1) and (3) of the Act.[1] The Board

---

1. Section 8(a) of the Act, 29 U.S.C. § 158(a), provides in part:

(a) It shall be an unfair labor practice for an employer—

adopted unchanged the ALJ's decision and order, holding that the Company's updating procedure was "inherently destructive of employee reinstatement rights under *Laidlaw* and related decisions," ALJ decision at 16, and ordering the Company to dismantle that procedure and undo its effects.

## II

Petitioner Giddings & Lewis argues: (1) the Board is incorrect in asserting that the petitioner must justify its notice procedure under the business justification standard—the petitioner's procedure is reasonable and therefore valid; (2) even if the business justification standard applies, the petitioner's notice procedure is valid; and (3) Section 10(b) of the Act bars all claims.

A. Because the last argument raises a threshold issue, we first address the statute of limitations problem. The petitioner argues that the alleged unfair labor practice charge is time barred by Section 10(b) of the Act, 29 U.S.C. § 160(b) (1947).[2] The petitioner claims that if the validity of

the periodic notice requirement depends on a finding of legitimate and substantial business justifications, then the operative event under Section 10(b) was the institution of the periodic notice procedure. This is so, the petitioner asserts, because only the then-existing circumstances are relevant to whether the newly instituted procedure was justifiable.

The Board challenges that analysis by noting that the unfair labor practice alleged in the complaint was application of the petitioner's procedure to an employee—not the institution of the procedure. To this the petitioner responds that there could not be a "continuing violation" because each removal of an employee from the preferential hiring list was not itself a violation of the Act. Moreover, an independent violation does not arise when illegality is established solely by assessing circumstances occurring outside of the Section 10(b) limitations period. *Local 1424, International Association of Machinists v. NLRB*, 362 U.S. 411, 422, 80 S.Ct. 822, 829, 4 L.Ed.2d 832 (1960) (*Bryan Manufacturing*).[3]

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7, guaranteeing rights pertaining to self-organization, concerted action, and collective bargaining]; . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

2. Section 10(b) of the Act, 29 U.S.C. § 160(b), provides in part:

(b) . . . no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against who such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. . . .

3. In *Bryan Manufacturing,* the employer executed a collective bargaining agreement with a union which did not then represent a majority of employees. Although charges were not filed until well after expiration of the Section 10(b)

limitations period, the Board contended that continued enforcement of the bargaining agreement constituted separate violations of the Act not protected by Section 10(b).

The Supreme Court rejected that contention, noting that enforcement of a clause of the agreement was itself innocent and could not be charged as an unfair labor practice when illegality depended upon reliance on circumstances outside of the Section 10(b) limitations period.

The Court said:

Where, as here, a collective bargaining agreement and its enforcement are both perfectly lawful on the face of things, and an unfair labor practice cannot be made out except by reliance on the fact of the agreement's original unlawful execution, an event which, because of limitations, cannot itself be made the subject of an unfair labor practice complaint, we think that permitting resort to the principle that § 10(b) is not a rule of evidence, in order to convert what is otherwise legal into something illegal, would vitiate the policies underlying that section. These policies are to bar litigation over past events "after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and

We disagree with the petitioner's characterization of this cause of action. The unfair labor practice charge alleged wrongful termination of an employee in violation of his right to preferential treatment as an economic striker. The Board, in affirming the ALJ's decision, found each removal of an employee from the preferential hiring list during the six months preceding the complaint an independent unfair labor practice. The evidence of circumstances surrounding institution of the periodic notice procedure therefore did not "cloak with illegality that which was otherwise lawful." *Bryan Manufacturing,* 362 U.S. at 417, 80 S.Ct. at 827. *See NLRB v. Preston H. Haskell Co.,* 616 F.2d 136, 145 (5th Cir.1980) (Hatchett, J., dissenting); *see also NLRB v. Albritton Engineering Corp.,* 340 F.2d 281, 285 (5th Cir.1965) ("[T]he Company committed a separate unfair labor practice each time . . . it bypassed for discriminatory reasons the application of a former striker.").

*NLRB v. R.L. Sweet Lumber Co.,* 515 F.2d 785 (10th Cir.), *cert. denied,* 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975), illustrates proper application of the *Bryan Manufacturing* analysis. The unfair labor practice charge there alleged, and the NLRB found, that the company rendered unlawful support and assistance to one union over another as the unions vied for the right to represent the company's employees. The company executed a contract, including a union security clause requiring all employees to unionize, with the unlawfully assisted union. These events transpired outside of the Section 10(b) limitations period. But within that period the company committed acts the Board found to be refusals to bargain.

Sweet Lumber Company, relying principally on *Bryan Manufacturing,* argued before the Tenth Circuit that all alleged illegalities depended on the legitimacy of the underlying contract signed outside of the six-month limitations period. The Tenth Circuit disagreed, reasoning that substantial activity adversely affecting the underdog union fell within the six-month period and that this activity independently constituted unfair labor practices. The court recognized that *Bryan Manufacturing* does not bar actions where evidence from outside the limitations period merely illuminates current conduct itself claimed as illegal.

We believe this case falls into the category of cases established by the *Bryan Manufacturing* court to be unaffected by Section 10(b):

where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not

---

confused," H.R.Rep. No. 245, 80th Cong., 1st Sess., p. 40, and of course to stabilize existing bargaining relationships.

　　　*　　*　　*　　*　　*　　*

[T]he vice in the enforcement of this agreement is manifestly not independent of the legality of its execution, as would be the case, for example, with an agreement invalid on its face or with one validly executed, but unlawfully administered. . . . [T]he complaints in this case are "based upon" the unlawful execution of the agreement, for its enforcement, though continuing, is a continuing *violation* solely by reason of circumstances existing only at the date of execution. To justify reliance on those circumstances on the ground that the maintenance in effect of the agreement is a continuing violation is to support a lifting of the limitations bar by

characterization which becomes apt only when that bar has already been lifted. Put another way, if the § 10(b) proviso is to be given effect, the enforcement, as distinguished from the execution, of such an agreement as this constitutes a *suable* unfair labor practice only for six months following the making of the agreement.

*Bryan Manufacturing,* 362 U.S. at 419, 422–23, 80 S.Ct. at 828, 829–30 (footnotes omitted). This case differs from *Bryan Manufacturing* because, while the *Bryan Manufacturing* collective bargaining agreement itself as applied was not an unfair labor practice, here the periodic notice procedure, if not justifiable, was facially invalid. Therefore, each incidence of terminating an economic striker's preferential hiring rights would constitute an unfair labor practice.

bar such evidentiary use of anterior events.

362 U.S. at 416, 80 S.Ct. at 826 (footnote omitted).

■ B. Having cleared the limitations hurdle, we next resolve the issue of what standard applies to judge the validity of the petitioner's periodic notice requirement.

In *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), the Supreme Court held that an employer commits an unfair labor practice by refusing to reinstate economic strikers, unless the employer can show that the refusal was due to "legitimate and substantial business justifications." *Id.* at 378, 88 S.Ct. at 545. The Court borrowed the quoted language from *NLRB v. Great Dane Trailers,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967), which in turn referred to Court opinions in *NLRB v. Brown,* 380 U.S. 278, 289, 85 S.Ct. 980, 987, 13 L.Ed.2d 839 (1965), and *American Ship Building Co. v. NLRB,* 380 U.S. 300, 311–13, 85 S.Ct. 955, 963–64, 13 L.Ed.2d 855 (1965). These cases established that certain employer conduct is inherently so prejudicial to employees' rights that an unfair labor practice is presumed unless the employer can prove legitimate and substantial business justifications to vindicate its actions. *See Laidlaw Corp. v. NLRB,* 414 F.2d 99, 103 (7th Cir.1969), *cert.*

denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970).[4]

Here, the periodic notice requirement instituted by the petitioner is indeed inherently destructive of employee rights; the procedure is designed to extinguish the preferential hiring rights of strikers. Nevertheless, the petitioner argues that any reasonable notice procedure is valid, claiming that the business justification standard is inappropriate. We disagree. Logic suggests that if an employee's statutory right to reinstatement is protected by the business justification standard, then a procedure which can destroy that right without affirmative action by the employee should be subjected to the same scrutiny. The Supreme Court has stated that preferential recall rights cannot hinge on technicalities relating to application. *Fleetwood Trailer Co.,* 389 U.S. at 381, 88 S.Ct. at 547. By applying the business justification standard to any procedure which threatens those rights—not just initial application for reinstatement—we can accommodate a company's desire and need for efficiency, yet at the same time safeguard an important employee right from unjustifiable, though perhaps "reasonable," burdens.[5] This analysis is consistent with the approach to preferential hiring rights taken by the majority of other circuits. *See, e.g., Soule Glass & Glazing Co. v. NLRB,* 652 F.2d 1055 (1st

**4.** "On the other hand, when 'the resulting harm to employee rights is ... comparatively slight, and a substantial and legitimate business end is served, the employers' conduct is prima facie lawful,'" and, barring proof of improper motivation, there is no unfair labor practice. *Great Dane Trailers,* 388 U.S. at 34, 87 S.Ct. at 1797 (quoting *NLRB v. Brown,* 380 U.S. 278, 289, 85 S.Ct. 980, 987, 13 L.Ed.2d 839 (1965)).

**5.** This position is not necessarily inconsistent with *NLRB v. W.C. McQuaide, Inc.,* 552 F.2d 519 (3d Cir.1977) (*McQuaide I*), relied on by the petitioner to support its reasonableness theory. The *McQuaide I* court noted that the employer must show business reasons to justify its refusal to reinstate economic strikers. In its discussion of whether the record supported the company's actions in refusing to rehire some workers, the court stated "The Company's request for notification of availability and interest is entirely reasonable and those who failed to respond should not be entitled to reinstatement." *Id.* at 532. Although wrested

from context this sentence indicated that the court judged the notification request under a reasonableness standard, in fact the Third Circuit was saying that, in light of legitimate business concerns, the company's request of employees to indicate a desire to be initially placed on the preferential hiring list was reasonable. The Third Circuit specifically recognized that reinstatement rights generally are protected by the business justification test. The court remanded the portion of its case which concerned these rights for factual findings designed to determine whether the employer's actions terminating recall rights for some strikers was justified.

Notably, *McQuaide I* came to the Third Circuit in a substantially different posture than the instant case. That court addressed the propriety of a method to initially collect names of economic strikers desiring placement on a preferential hiring list, not whether employees who have already claimed an interest can be removed from it for failure to reiterate that interest at six-month intervals.

Cir.1981); *NLRB v. Proler International Corp.*, 635 F.2d 351 (5th Cir.1981); *NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567 (7th Cir.1980); *Zapex Corp. v. NLRB*, 621 F.2d 328 (9th Cir.1980); *NLRB v. New York–Keansburg–Long Branch Bus Co.*, 578 F.2d 472 (3d Cir.1978); *NLRB v. Fire Alert Co.*, 566 F.2d 696 (10th Cir.1977).

### III

█ The Board ruled that, "although the Employer was afforded here a full opportunity to present business justification for the unilateral implementation of this procedure some two or more years after reinstatement had commenced, the proofs adduced, at best, only show 'administrative convenience' as a reason for this procedure." ALJ decision at 16. Here is where we disagree with the Board's conclusions. The Board's holding that "administrative convenience," *Vitronic Division of Penn Corp.*, 239 N.L.R.B. 45, 48 (1978), *enforcement denied on rehearing* en banc *by an evenly divided court*, 630 F.2d 561 (8th Cir.1979), does not rise to the level of legitimate and substantial business justifications is certainly correct. Nevertheless, although the Board has principal responsibility "to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy," *Great Dane Trailers*, 388 U.S. at 33–34, 87 S.Ct. at 1797; we must set aside any decision we believe incorrect when we "cannot conscientiously find that the evidence supporting that deci-

sion is substantial." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Under the specific circumstances of this case, the particular periodic notice procedure used by the petitioner was justifiable, and not merely an administrative convenience.

For two years the petitioner hired exclusively from the hiring list it established in January 1977. By 1979, when nearly sixty percent of the strikers originally on the list had been hired away or otherwise dropped, the percentage of employees refusing an offer of reinstatement had grown to forty percent. In the meantime, the petitioner's business experienced marked growth.[6]

Normally, when an offer of reinstatement was accepted by the first striker to whom it was made, the rehiring process took only about two weeks—one for the striker to make the decision, another to get her or him back on the job. If one or more strikers declined the offer, then the process took much longer because the petitioner had to allow time for each striker to decide whether to return.

As time passed, more and more strikers found other jobs, naturally causing them to use more time to make those decisions. The periodic notice requirement was designed at least to reduce the number of refusals.[7] The petitioner's personnel supervisor testified:

> We had run into a number of situations where people had either found other employment, had moved away, or for one

---

Although not mentioned by either party, the Third Circuit reconsidered its opinion in an appeal after remand. *NLRB v. W.C. McQuaide, Inc.*, 617 F.2d 349 (3d Cir.1980) (*McQuaide II*). That opinion makes crystal clear that the "reasonableness" of the notification request is inextricably linked with the standard of legitimate and substantial business justifications. The court enforced the NLRB's order requiring the company to offer reinstatement to certain striking dockworkers including those who had responded to the notification request. The *McQuaide II* court stated:

> [T]here was no substantial business reason justifying the refusal to offer reinstatement, and, accordingly, the dockworkers were entitled to reinstatement on the same basis as the other strikers.... An employee should not be held to have waived his right to be offered reinstatement due to his failure to

respond to a letter which did not offer reinstatement.

*Id.* at 354–55 (citing *Fleetwood Trailer Co.*).

**6.** For example, from calendar years 1977 to 1979 shipments from the petitioner's Fond du Lac, Wisconsin, division grew from $45.7 million to $89.1 million. (R.Exh. 9.)

**7.** The Board concedes that the periodic notice procedure reduced the refusal rate; the percentage of refusals fell from 40 percent to 26 percent. The Board argues, nevertheless, that this "marginal improvement" in the hiring process does not substantially justify the procedure. We think the 14-percent decrease (a 35-percent improvement) is significant. This fact plays no part in our decision, though, for we believe that results should not be considered to justify institution of a procedure.

reason or another were no longer interested in reinstatement at Giddings & Lewis. Yet we were going through some lengthy delays in filling these jobs, because they would take their full calendar week before we would learn that they're not interested in returning to work. Because we were manning the plant rather tightly, and we were becoming more and more productive, there was more and more pressure to fill these jobs as they became open. As we got an opening, [there was] more and more pressure to make sure that we got someone in and got that job filled.

(Tr. at 80.)[8] The notice procedure helped eliminate some of the difficulties in locating the potential hirees, and, equally important, allowed completion of some of the administrative chores before an opening occurred—further expediting the hiring process.

We note that the two-year period during which the petitioner used the preferential hiring list without a notice requirement is a key element in our analysis. The petitioner in its briefs and argument recognized the significance of its decision to require reaffirmation of interest only after the hiring list had been pared to less than half of its original number over two years. The passage of time exacerbates the problems of locating and notifying strikers. And, while professed difficulties in locating employees with preferred hiring rights alone cannot justify a notice requirement such as the one before us, when those difficulties impede the growth and progress of a company, then a notice procedure may be proper.[9]

The NLRB argues that "net savings" attributable to the petitioner's new system could never be "so substantial as to justify the total elimination of employee reinstatement rights." (NLRB br. at 20–21.) But the procedure we approve here is no such calamity. The system itself does not extinguish any right, though it is designed to determine who is interested in reinstatement, ultimately leading to removing employees from the list. We are more concerned with the burden the procedure places on the employees' exercise of their rights guaranteed by the Act. That burden is notifying the employer twice each year of a desire to remain on the preferential hiring list.[10] The system does not discourage employees from exercising their rights, does not greatly interfere with those rights, and is not discriminatory.

## IV

Section 10(b) of the National Labor Relations Act does not bar actions on indepen-

Rather, we are concerned with the circumstances existing at the time the procedure was developed.

**8.** The personnel supervisor testified to one occasion when the company contacted five persons on the preferential hiring list before successfully filling a position. The first person could not be located, the third person did not respond, and the second and fourth workers refused their offers. The first offer was made June 30, the position was accepted July 18, and reinstatement completed August 14. (R.Exh. 10; Tr. at 92–94.)

**9.** In *Laidlaw Corp. v. NLRB*, 414 F.2d 99 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970), the petitioner argued against maintaining preferential hiring rights in perpetuity. This circuit rejected that argument in part because the petitioner refused reinstatement only days after strikers applied and vacancies occurred. We recognized that an employer's duty to seek out strikers for reinstatement was not a "severe burden" in practice. *Id.* at 105 n. 9. But that burden increases as time passes.

Additionally, that the petitioner conscientiously used the hiring list for two years before resorting to a notice procedure is convincing evidence that the petitioner genuinely was concerned about and motivated by the effects of the hiring delays on its business.

**10.** To this extent, our reasoning is inconsistent with Board dictum in *Charleston Nursing Center*, 257 N.L.R.B. 554 (1981). The Board there decided that an initial letter from the employer to all unreinstated strikers violated Section 8(a)(1) because it "was not merely a reasonable inquiry made by Respondent to update its information on ... interest in reinstatement of the strikers but in addition implied that the strikers must affirmatively respond to the letter in order to retain their rights to reinforcement in the future." *Id.* at 556. The Board stated that any termination of rehiring rights based on that letter would be premature, for no position was actually available. The Board continued:

Further, the burden on the employer would be slight: it need only maintain a nonresponding employee's name on the preferential hiring list until he is offered reinstate-

dent acts charged as unfair labor practices that occur within its limitations period, even when relevant activity transpired outside of the six-month limitations period.

When, as here, an action taken by an employer is inherently destructive of an employee's preferential hiring status, the employer must show legitimate and substantial business justifications for its actions. The petitioner met that burden. The notice requirement was designed to shorten rehiring delays that significantly affected the petitioner's operations. The procedure was reasonable and fair. For these reasons, and considering all of the factors discussed above, we conclude that there were no violations of Sections 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) & (3). The Company's petition for review is granted and the Board's order is set aside.

ENFORCEMENT DENIED.

ment and either refuses or fails to respond to the job offer. The burden on the employee, however, is severe: termination of all reinstatement rights.

*Id.* We think this quotation mischaracterizes the employees' burden. If a notice procedure is supported by legitimate and substantial business justifications, it then must be weighed against an employee's *exercise* of rights protected by the Act.